UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SCOTT CHODEN, | ) |
| | ) |
| **Plaintiff**, | ) |
| | ) |
| v. | ) No. 4:19-CV-2345-PLC |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| **Acting Commissioner Social Security,** | ) |
| | ) |
| | ) |
| **Defendant**. | ) |

## MEMORANDUM AND ORDER

Plaintiff Scott Choden seeks review of the decision of Defendant Acting Commissioner of Social Security Kilolo Kijakazi denying his application for Disability Insurance Benefits (DIB) under the Social Security Act. The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). [ECF No. 4] For the reasons stated below, the Court reverses and remands the Commissioner's decision.

I.   **Background and Procedural History**

In March 2016, Plaintiff, who was born in June 1960, filed an application for DIB alleging he was disabled as of November 28, 2014[2] as a result of: "bipolar manic depression; ADHD; osteoarthritis in neck and lower back; pain; legal blindness right eye; glaucoma, right eye; microscopic colitis; hyp[o]gonadism including low testosterone; hyperaldosteronism (adrenal glands); fatty liver disease; OCD." [ECF No. 117-34, 207-08]

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] At the administrative hearing, Plaintiff amended the alleged onset date to June 27, 2015, his fifty-fifth birthday. [ECF No. 228]

1

The Social Security Administration (SSA) denied Plaintiff's claims in July 2016, and he filed a timely request for a hearing before an administrative law judge (ALJ). [ECF No. 138-42, 145-57]  The SSA granted Plaintiff's request for review and conducted a hearing in April 2018. [ECF No. 194-95]

In a decision dated August 2018, the ALJ determined that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from June 27, 2015, the alleged onset date, through December 31, 2017, the date last insured."  [ECF No. 30]  Plaintiff subsequently filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. [ECF No. 1-6]  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision.  Sims v. Apfel, 530 U.S. 103, 107 (2000).

**II.     Testimony at the ALJ Hearing**

Plaintiff testified that he lived with his mother and last worked on November 28, 2014 as a network engineer performing contract work for AT&T.  (Tr. 65-66, 81)  Plaintiff's employment ended when AT&T "opted to end [the contract] prior to the holidays."  (Tr. 66)  When the ALJ observed that various treatment notes in Plaintiff's records reflected that Plaintiff continued to look for work, Plaintiff denied looking for work after November 2014.  (Tr. 68-70)  However, after the ALJ cited specific notations relating to Plaintiff's continued job search, Plaintiff testified:  "Well, I had looked around on the Internet from time-to-time for work in telecommunications…. I'm always looking to see what there is that the job market is providing…[t]hat fits with my needs." (Tr. 73)  Plaintiff explained that he required a job with "daytime hours free" to attend doctor appointments and "something that was not physical," like "computer work."  (Tr. 74)

The ALJ observed that Plaintiff received treatment for many of his "physical and mental issues" while he was working and asked whether there was "anything in particular that you have

that has worsened?" (Tr. 77) Plaintiff answered: "[P]rimarily it has been the spine, the neck, in the cervical and the lumbar." (Id.) Plaintiff explained that he could not "sit for a long period of time, or stand. I have to alternate. Sometimes I just have to go lie down…." (Tr. 78) Plaintiff struggled with side effects from medications and had to refrain from "certain physical activities," such as "mowing the lawn, removing snow, even minor housecleaning stuff." (Id.)

Plaintiff stated that he underwent physical therapy, but it did not help "at least in the short term, because it aggravated the pain." (Tr. 79) Plaintiff testified that radiofrequency ablation reduced his neck pain, but added, "at the same time, I'm not sitting in front of a computer like I used to." (Tr. 80) Because the radiofrequency ablation did not help Plaintiff's lumbar pain, his pain management specialist sent him to a dermatologist, who diagnosed Plaintiff with psoriasis. (Id.) Plaintiff explained that his back pain "extends beyond even the spine. Sometimes I'll get it in the elbows. I'll get it in my feet. It pretty much makes me miserable at times. Sometimes I'm okay." (Tr. 81) Plaintiff recently started administering Cosentyx "injections myself in my thighs periodically for psoriatic arthritis," but it was "too soon to determine whether or not that's helping…." (Tr. 81)

In regard to mental impairments, Plaintiff testified that he received consistent treatment for "bipolar depression" since "roughly 1980[.]" (Tr. 90) Plaintiff stated that, despite taking medications as directed, he "still notice[d] symptoms." (Tr. 92) His most notable symptoms were "major depression, anxiety…. lack of focus…." (Tr. 93) Plaintiff explained that Buspar "reduce[d] his anxiety," and he took clonazepam for "sleep issues," but it "affects my memory." (Tr. 94)

A vocational expert also testified at the hearing. (Tr. 95-107) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and past

3

work experience with the ability to perform a range of medium work with the following limitations:

> Occasional balance, stoop, kneel, and crouch. Occasional overhead reaching bilaterally. No extremes of heat or cold. And no exposure to chemicals. He has monocular vision on the left, so occasional peripheral vision, and no hazards such as unprotected heights, or moving machinery. Can climb ramps and stairs, but no ladders, ropes, or scaffolds.

(Tr. 97) The vocational expert testified that such an individual could perform Plaintiff's past work as a network control operator and project manager, but not network engineer. (Tr. 97-98)

When the ALJ added that the hypothetical individual "can understand, remember more than simple instructions tasks, such as detailed instructions or tasks, but no complex [instructions or tasks]," the vocational expert stated that the individual could not perform Plaintiff's past relevant work. (Tr. 98, 102). However, such an individual could perform the jobs of "band wrapper and packer," dining room attendant, and amusement park worker. (Tr. 103) When the ALJ limited the hypothetical individual to light work with no mental limitations, the vocational expert testified that he could work as a network control operator. (Tr. 104-05)

**III.    Standards for Determining Disability Under the Social Security Act**

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

4

experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.152(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(f); McCoy, 648 F.3d at 611. If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R § 404.1520(g); Brock

5

v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then she will be found to be disabled.  20 C.F.R. § 404.1520(g).

### IV.     ALJ's Decision

In her decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520. (Tr. 15-30).  First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from his amended alleged onset date of June 27, 2015 through his date last insured of December 31, 2017.  (Tr. 17)  At step two, the ALJ found that Plaintiff had the following severe impairments:  cervical degenerative disc disease and arthritis; lumbar degenerative disc disease and arthritis; right eye blindness with remote onset; glaucoma; hypertension; history of obstructive sleep apnea; history of irritable bowel syndrome and colitis; hiatal hernia and GERD; fatty liver disease; rosacea and dermatitis; diabetes mellitus; hyperaldosteronism; obesity; bipolar disorder; depression; attention deficit disorder; somatic component; and alcohol abuse disorder. (Id.)  Additionally, the ALJ found that Plaintiff had the non-severe impairment of a hand tremor. (Tr. 18)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17)

Based on his review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "severe impairments could have reasonably been expected to cause some of the symptoms," but his "allegations regarding the limiting effects of his symptoms are not entirely consistent with the medical evidence, the observations of his doctors, the statements he has made to his doctors, his activities of daily living, and other evidence in the record[.]"  (Tr. 23) Additionally, the ALJ found that the following factors undermined Plaintiff's subjective allegations of disabling symptoms:  "no impairment[-]related event to correlate to the alleged onset

6

date; a non-impairment related reason for not working at substantial gainful activity; inconsistencies in the treatment record; and activities of daily living." (Tr. 23) The ALJ determined that Plaintiff had the RFC to perform medium work[3] with the following limitations:

> Occasional[ly] balance, stoop, kneel, crouch, or crawl; occasional overhead reaching bilaterally; no extremes of heat or cold, and no exposure to chemicals; monocular vision on the left, so occasional peripheral vision, and no hazards such as unprotected heights or moving machinery; can climb ramps and stairs, but no ladders, ropes, or scaffolds; frequent, but not constant, handling and fingering bilaterally; can understand, remember, and carry out MORE than simple instructions and tasks such as detailed instructions and tasks, but no complex instructions or tasks.

(Tr. 22) (emphasis in original).

Based on the vocational expert's testimony, the ALJ concluded that, through the date last insured, Plaintiff was unable to perform past relevant work, but had the RFC to perform other jobs that existed in significant numbers in the national economy, such as "wrapper and packer bander" and amusement park worker. (Tr. 29) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 30)

### V.    Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision. [ECF No. 13] Specifically, Plaintiff argues that the ALJ failed to: (1) properly evaluate the opinion of Plaintiff's treating physician, Dr. King; and (2) include limitations in the RFC for Plaintiff's moderate deficiencies in concentration, persistence, and pace. Plaintiff also challenges the ALJ's finding

---

[3] Under the SSA regulations, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary or light work." 20 C.F.R. § 404.1567(c). The regulations define "light work" as work that "requires a good deal of walking or standing, or … involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). To be capable of performing light (or medium) work, a claimant must be able to stand or walk for six hours of an eight-hour workday. Combs v. Berryhill, 878 F.3d 642, 645 n. 5 (8th Cir. 2017) (citing Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995)).

7

that Plaintiff had the RFC to perform medium work, arguing that the evidence supported an RFC for no greater than light work, which, combined with his advanced age and non-exertional limitations, would have compelled a finding of disability under the Grid Rules.[4]  The Commissioner counters that the ALJ properly considered the entire record, including the medical opinion evidence, when determining Plaintiff's RFC. [ECF No. 16]

   A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome."  Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

---

[4] The Medical-Vocational Guidelines, or "Grid Rules," are "a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012) (quoting McCoy v. Astrue, 648 F.3d 605, 613 (8th Cir. 2011)).

8

B. Medical Opinion Evidence

Plaintiff claims the ALJ erred in discrediting the opinions of his primary care physician, Dr. King. [ECF No. 13]  In response, the Commissioner asserts that the ALJ properly considered Dr. King's opinions and determined they were not entitled to significant weight because they were inconsistent with her treatment notes and Plaintiff's medical records.  [ECF No. 16]

"Under the relevant regulations, an ALJ must give a treating physician's opinion controlling weight if it well-supported by medical evidence and not inconsistent with the substantial evidence in the record."  Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2)).  "Even if not entitled to controlling weight, such opinions 'typically are entitled to at least substantial weight, but may be given limited weight if they are conclusory or inconsistent with the record.'"  Schwandt v. Berryhill, 926 F.3d 1004, 1011 (8th Cir. 2019) (quoting Julin v. Colvin, 826 F.3d 1082, 1088 (8th Cir. 2016)).  This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians.  See 20 C.F.R. § 404.1527(c); Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007)).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization.  20 C.F.R. § 404.1527(c).  Whether the ALJ grants a treating

9

physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).  SSA guidance requires that the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers … the reasons [for the decision]." Lucus, 960 F.3d at 1068 (alterations in original) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Plaintiff had a long history of treatment with pain management, injections, and drug therapy.  An MRI of Plaintiff's cervical spine in April 2015 revealed "multilevel cervical spondylosis" and "multilevel foraminal stenosis … due to the uncovertebral joint disease and facet disease, most severe on the right at C5-C6."  (Tr. 554-55)  Plaintiff's physician referred Plaintiff to a neurosurgeon and a pain management specialist.  (Tr. 553)  X-rays of Plaintiff's cervical spine in May 2015 showed "mild anterolisthesis of C4" and "C5 to C7 degenerative disc disease."  (Tr. 590)  Plaintiff was prescribed Norco and tramadol, and he underwent cervical medial branch nerve steroid injections in June 2015, medial branch nerve radiofrequency rhizolysis in July 2015, and trigger point injections in August 2015.  (Tr. 527, 530, 534, 536)  An MRI of Plaintiff's lumbar spine in August 2015 revealed "[m]ild spondylosis at L4-L5 with a small right paracentral disc herniation exhibiting caudal extension" and "[m]inimal posterior disc bulging at L5-S1."  (Tr. 985)

Dr. King began treating Plaintiff in May 2016.[5]  At his first appointment, Plaintiff complained of chest congestion.  (Tr. 859)  In discussing his medical history, Plaintiff informed Dr. King that he had "osteoarthritis and bulging discs.  Has had injections in neck.  Sometimes

---

[5] When Plaintiff established care with Dr. King, he explained that his previous doctor, Dr. Augustine, did not accept his insurance.  (Tr. 859)

takes muscle relaxers." (Id.)  In regard to his mental health, Plaintiff reported that he "[f]eels quite down now…. He has been out of work for some time, not much hope for finding a new job due to his diminished skills along with his mental state."  (Id.)  Plaintiff's physical examination was unremarkable, except that he "displays tremor (mild, worse right)." (Tr. 862)

In June 2016, Plaintiff saw Dr. Ahmad at AMR Pain & Spine Clinic, for treatment of neck and back pain.  (Tr. 742)  At that time, Plaintiff was taking, among other medications, Prozac, Klonopin, Ritalin, Flexeril, Zyprexa, and gabapentin.  (Id.)  Dr. Ahmad noted that a lumbar MRI from August 2015 revealed:  "L3-4 mild disc bulging, L4-5 right central disc herniation, L5-S1 has bulging.  And moderate facet arthroscopy at L4-5 and L5-S1."  (Id.)  A cervical MRI showed "multiple spondylosis from C2-3 to C6-7.  Worse at C5-6 level."  (Id.)  On physical examination, Dr. Ahmad observed "normal curvature of the cervical spine.  Anterior flexion is noted to full – 60 degrees.  Extension of cervical spine noted to be full at 75 degrees."  (Tr. 743)  As to Plaintiff's lumbar spine, Dr. Ahmad noted:  "palpation of the lumbar facet reveals left sided pain at L3-S1.  There is pain noted over lumbar intervertebral spaces (discs) on palpation.  Anterior lumbar flexion does not cause pain.  There is pain noted with lumbar extension." (Tr. 743)  Dr. Ahmad diagnosed Plaintiff with cervical and lumbar spondylosis and moderately severe arthritis, and he administered right L3-4-5 lumbar medial branch nerve blocks "with good pain relief."  (Tr. 744, 930)  Dr. Ahmad repeated the medial branch nerve blocks the following month.  (Tr. 931)

When Plaintiff followed up with Dr. King in July 2016, his chief complaint was bipolar disorder.  (Tr. 880)  Plaintiff informed that Dr. King that "lidocaine injections helped [his back pain] greatly, but short term.  Now set up for ablation procedure next month.  Wants to work on neck next." (Id.)

11

In August 2016, Dr. Ahmad performed L3-4-5 medial branch radiofrequency ablation "with good pain relief." (Tr. 731-32) When Plaintiff returned to Dr. King's office in October 2016, he complained of dark urine, chest tightness, and cough, and also reported sleep disturbance and dysphoric mood. (Tr. 885) Dr. King diagnosed acute bronchitis and prescribed prednisone. (Tr. 885, 888) Plaintiff's physical exam was unremarkable. (Tr. 888)

Dr. King examined Plaintiff in February 2017 and noted that he was "positive for" appetite change, fatigue, abdominal pain, "arthralgias, back pain and neck pain," tremors, dysphoric mood, and sleep disturbance. (Tr. 997) Dr. King observed that Plaintiff was "nervous/anxious," but his physical examination was normal. (Id.) Dr. King recommended Plaintiff "cut back (and stop) his alcohol intake as well as see a GI doctor for further evaluation." (Tr. 998)

Dr. King completed a medical source statement (MSS) for Plaintiff. (Tr. 893-94) In regard to Plaintiff's symptomatology and diagnoses, Dr. King stated:

> Bipolar depression – he is typically in a depressed mood, feels very down. Numerous medications have failed. Trouble functioning normally, getting out of bed, getting out of the house. Generalized anxiety disorder: he is significantly anxious/worried all the time. Essential tremor: Affects both arms. Most of the time he has great difficulty writing anything legible, has difficulty with other fine movements. Right eye blindness – some visual limitation due to that. Degenerative disc disease of levels between C3-C4 and C6-C7, and between L3-L4 and L5-S1, causing chronic neck and back pain. He has numerous other diagnoses that are not relevant to disability, but several of them do require medications which have sedating side effects.

(Tr. 893) In support of these findings, Dr. King cited: "Cervical and Lumbar Spine MRIs are available showing the issues mentioned above. Bilateral upper extremity tremor is apparent[] with movements, and sometimes at rest. His mood has been down at visits, and his questioning/topics/frequency are typical of highly anxious people…." (Id.) Dr. King acknowledged that there was "otherwise not much objective support that could be obtained with his diagnoses." (Id.)

Dr. King opined that Plaintiff's subjective complaints were "reasonably consistent with the objective findings," and concluded that "the combined effect of his impairments makes him incapable of full time (even sedentary) work." (Id.) Dr. King explained:

> [Plaintiff's] back and neck issues rule out any physical job. He also has to change position frequently due to his back. His tremor makes it difficult to write or do fine controls such as with a computer mouse. He sometimes has trouble typing with it. His mental health issues make it difficult to find work, and get his work done. His medicines also leave him fatigued, sometimes sedated, which makes everything harder.

(Id.) Dr. King also assessed Plaintiff's ability to perform work related activities as follows: "[s]ustained lifting and carrying is not possible (less than sedentary range)"; "[s]ustained standing and walking is not possible (less than sedentary range)"; able to sit "at least 6 hours in an 8-hour workday (sedentary range)," with the added limitation that he "[m]ust periodically alternate between sitting and standing to relieve pain or discomfort. Alternate every 45? [sic] minutes." (Tr. 894) Finally, Dr. King opined that Plaintiff could not frequently grasp, hold, or perform fine manipulation with either hand. (Id.)

Later that month, Plaintiff saw Dr. Sohn at Mid-County Orthopaedic for neck and lower back pain.[6] (Tr. 939) At that time, Plaintiff's medications included naproxen, spironolactone, cyclobenzaprine, fluoxetine, and hyoscyamine sulfate. (Id.) Plaintiff rated his pain as "2-9/10" and stated that it "bothers him with sitting, standing, bending or with any exertion. It is across the low back left greater than right in the right neck area." (Tr. 940) Plaintiff informed Dr. Sohn that injections and radiofrequency neurotomy (RFN) "have been helpful," but "the pain has come back on the left and is bothering him on the right in the low back as well." (Tr. 939) On examination, Dr. Sohn observed: normal stance and gait; poor extension with pain in low back; positive Stork's

---

[6] Plaintiff explained that, "because of [his] insurance changes, he is switching pain doctors again." (Tr. 939)

13

maneuver left greater than right with pain; deep tendon reflexes 2+ at the knees, 1+ at the ankles; straight leg raise was negative; head and neck appeared normal; range of motion decreased on right rotation due to pain; not tender to palpation; lower and upper extremity strength and sensation were intact. (Tr. 940)  Dr. Sohn diagnosed bilateral low back pain without sciatica and spondylosis of lumbosacral region, and he administered medial branch blocks at C5 and C6.  (Tr. 941)

When Plaintiff returned to Dr. Sohn's office the next month, he reported that the bilateral blocks "gave him excellent relief of his pain with 80 to 100% improvement."  (Tr. 942)  Dr. Sohn performed RFN.  (Tr. 943)

In April 2017, Plaintiff followed up with Dr. Sohn and reported 75% improvement with "some recurrence on the right side and somewhat across the back."  (Tr. 945)  Plaintiff was taking Naprosyn, and Dr. Sohn recommended he resume Flexeril at bedtime.  (Id.)  On examination, Dr. Sohn observed that Plaintiff's mood was stable, gait and stance were normal, extension was "fair to poor with pain," lower extremity strength was in tact, and he was not tender to palpation.  (Tr. 946)   Dr. Sohn prescribed home exercises.  (Id.)

When Plaintiff returned to Dr. Sohn's office in May 2017, he reported "ongoing back pain issues" and some benefit from Naprosyn and Flexeril.  (Tr. 948)  Plaintiff's physical examination was similar to that of the previous month except that his lower back was tender to palpation.  (Tr. 949)   Dr. Sohn administered trigger point injections "in bilateral low lumbar paraspinals," prescribed Amrix, and encouraged Plaintiff to do the prescribed home exercises.  (Id.)

In June 2017, gastroenterologist Dr. Shah treated Plaintiff for GERD and IBS.  (Tr. 1028)  Dr. Shah continued Plaintiff's omeprazole, increased the frequency of his hyoscyamine, and opined that "the majority of his symptoms are functional and not acid reflux-related."  (Tr. 1029)

Plaintiff followed up with Dr. Sohn in July 2017 and reported that the bilateral trigger point injections "did not really seem to give him much relief." (Tr. 951) Dr. Sohn referred Plaintiff to a rheumatologist. (Tr. 952)

Plaintiff presented to rheumatologist Dr. Ince for treatment of joint pain in September 2017. (Tr. 968) Plaintiff complained of "intermittent pain, stiffness and swelling in his left shoulder and neck causing numbness and tingling in his fingers/thumb." (Id.) Plaintiff's morning stiffness lasted two to three hours and his pain was worse at the end of the day. (Id.) Plaintiff's physical examination was generally unremarkable except for an erythematous rash on his chest. (Tr. 971) Dr. Ince ordered lab work "to rule out inflammatory arthropathies as well as x-rays of his C-spine and SI joints and NCS to rule out impingement." (Id.) The x-rays revealed cervical spondylosis most pronounced at C5-6 and C6-7 levels and mild osteoarthritic change of hip joints and SI joints. (Tr. 968, 983) An EMG with nerve conduction study was normal. (Tr. 1125)

In October 2017, Dr. Ince referred Plaintiff to neurologist Dr. Forget. (Tr. 954-58) Plaintiff informed Dr. Forget that his neck pain was "localized to the posterior cervical region and has been present for a few [sic]. It is moderate (3-6/10) in severity and does not radiate. The pain is described as being constant and is generally following no specific pattern. The patient states the pain is aggravated by head turning." (Tr. 954) Dr. Forget stated that Plaintiff's neurologic exam was unremarkable and opined: "I do not see anything from a surgical standpoint to do. He has multilevel degenerative disc disease and some arthritic changes but no signs of radiculopathy or myelopathy. I would just recommend physical therapy for him, which I prescribed today." (Tr. 958) Plaintiff began physical therapy later that month. (Tr. 1058)

Plaintiff followed up with Dr. Ince in late October 2017. (Tr. 964) Plaintiff rated his pain as 7/10. (Tr. 966) Dr. Ince recommended Plaintiff follow up in three months with a nurse

practitioner "to monitor his LFT's as he has hepatic steatosis." (Tr. 967)  The following month, Plaintiff saw a dermatologist, who diagnosed Plaintiff with psoriasis and offered him "a biologic" for joint pain, which Plaintiff declined due to changing insurance.  (Tr. 1160-61)  The dermatologist started Plaintiff on Consentyx in January 2018.  (Tr. 1156)

Plaintiff returned to Dr. King for a physical examination in December 2017.  (Tr. 1118) Plaintiff expressed "[f]rustration with pain issues.  Both neurosurgeon and rheumatologist directing him to the other[.]"  (Tr. 1118)  Plaintiff reported some improvement with physical therapy manipulations and was "considering treatment with injectable for psoriasis."  (Id.) Plaintiff stated that his tremors were "intermittent, sometimes minimal, sometimes bothersome." (Id.)  On examination, Dr. King noted that Plaintiff's right pupil was "reactive but irregular" and his liver enzymes were "much improved, but still abnormal." (Tr. 1121-22)

Dr. King completed a second MSS for Plaintiff in January 2018.  (Tr. 1147-48)  Dr. King listed Plaintiff's diagnoses as:  bipolar II disorder, essential tremor, lumbar and cervical degenerative disc disease, general anxiety disorder, psoriatic arthritis, obstructive sleep apnea, ADHD, fatty liver, right eye legal blindness, microscopic colitis, hypogonadism, hyperhidrosis, osteoarthritis, high cholesterol, hypertension, and GERD.  (Tr. 1147)  Dr. King stated that Plaintiff's primary symptoms included "chronic neck and back pain, multiple joint pains, stiffness, depressed mood, tremor, and anxiety."  (Id.)  Dr. King estimated that Plaintiff could:  sit a total of four hours "interrupted" and stand/walk no more than one hour in an eight-hour workday; occasionally lift/carry up to, but never more than, five pounds; never reach overhead or push/pull; occasionally reach laterally and push/pull; and occasionally handle objects and use hands and fingers for fine manipulation. (Tr. 1147-48)  Finally, Dr. King opined that, as a result of Plaintiff's

impairments or treatments, he would be absent from work more than three times per month. (Tr. 1148)

The ALJ reviewed and weighed Dr. King's medical opinions. In regard to the February 2017 MSS, the ALJ noted that Plaintiff had met with Dr. King two days prior, "asked her for help with his disability claim," and "reported to her that he was drinking six beers a day." (Tr. 26) Because Dr. King's physical examination was generally normal, the ALJ surmised that Dr. King "issued a favorable report on the claimant's subjective statements to her." (Id.) The ALJ concluded that Dr. King's assessment was inconsistent with the objective medical evidence and therefore "cannot be given significant weight." (Id.) The ALJ similarly discredited Dr. King's MSS of January 2018, stating that the "objective medical evidence and/or her own observations do not support her assessment. It cannot be given significant weight." (Id.)

As support for her decision to discredit Dr. King's opinions, the ALJ stated that Dr. King's opinions were inconsistent with the objective medical evidence. While inconsistencies can justify rejecting a treating physician's opinion, the ALJ must make her reasoning "sufficiently specific to make [it] clear to any subsequent reviewers." Lucus, 960 F.3d at 1068 (quoting SR 96-2 at *5). "[B]oilerplate or 'blanket statements' will not do." Id. at 1069 (quoting Walker v. Commissioner, 911 F.3d 550, 554 (8th Cir. 2018)). Here, the ALJ identified only one inconsistent medical record, specifically, a physical examination of February 2017 that "showed nothing abnormal." (Tr. 26)

Furthermore, the Court finds, based on a review of the record as a whole, that the imaging studies and physical examinations supported the functional limitations identified by Dr. King. For example, MRIs from April and May 2015 showed L3-4 mild disc bulging, L4-5 right central disc herniation, L5-S1 disc bulging, moderate facet arthroscopy at L4-5 and L5-S1, and multiple spondylosis from C2-3 to C6-7. (Id.) A physical examination by pain management specialist Dr.

17

Ahmad in June 2016 showed pain with lumbar extension and pain on palpation of the lumbar facet and lumbar intervertebral spaces.  In February 2017, Dr. Sohn noted that MRIs of Plaintiff's lumbar spine showed degenerative changes, disc bulges, and facet arthropathy at L4-5 and L5-S1, and an MRI of his cervical spine showed right C5-6 facet arthropathy, degenerative changes, and mild disc bulges.  On physical examination, Dr. Sohn observed poor extension with pain in the low back, positive Stork's maneuvers with pain, and decreased range of motion in the neck. In May 2017, Dr. Sohn noted that Plaintiff's extension was fair with pain and his low back was tender to palpation.  X-rays taken in September 2017 revealed cervical spondylosis and mild osteoarthritic change of hip joints and SI joints.  The record does not support the ALJ's conclusory finding that Dr. King's opinions were inconsistent with the objective medical evidence.

The ALJ also discredited Dr. King's opinions because they were not supported by her treatment notes.  A review of Dr. King's treatment notes, however, reveal that she consistently noted Plaintiff's complaints of back and neck pain, abdominal problems, and low energy and mood.  In her May 2016 review of systems, Dr. King stated that plaintiff was positive for fatigue, unexpected weight change, congestion, cough, diarrhea, constipation, back pain, arthralgias, and dysphoric mood, and he was "nervous/anxious."  In July 2016, Dr. King noted that Plaintiff was positive for fatigue, postnasal drip, cough, nausea and vomiting, back and neck pain, allergies, and dysphoric mood, and he was "nervous/anxious."  At that time, Plaintiff informed Dr. King that lidocaine injections relieved his chronic back pain, but only short term.  In February 2017, Dr. King noted Plaintiff's reports of appetite change, fatigue, abdominal pain, arthralgias, back and neck pain, tremors, dysphoric mood, and sleep disturbance, and she observed an essential tremor affecting both arms.  Dr. King's treatment notes reflected the same symptoms and diagnoses as her medical source statements.

18

The ALJ also discounted Dr. King's opinions regarding Plaintiff's workplace limitations because Dr. King relied on Plaintiff's subjective complaints. The Eighth Circuit has repeatedly found it appropriate for an ALJ to discount a doctor's report where it is based largely on a claimant's subjective complaints. See, e.g., Julin, 826 F.3d at 1089. While it appears Dr. King relied, at least in part, on Plaintiff's self-reported limitations, she also cited in the February 2017 MSS, Plaintiff's cervical and lumbar spine MRIs and his bilateral upper extremity tremor. Accordingly, Dr. King's did not base her assessment of Plaintiff's functional limitations entirely on his subjective complaints.

Dr. King was the only physician, examining or non-examining, to express an opinion regarding Plaintiff's work-related physical limitations. See, e.g., Farrar v. Colvin, No. 1:15-CV-116 ACL, 2016 WL 5405406, at *8 (E.D. Mo. Sep. 28, 2016). In her MSS of February 2017, Dr. King found Plaintiff was able to sit up to six hours per eight-hour workday, but he was unable to perform any amount of "sustained lifting and carrying" or "sustained standing and walking." According to Dr. King's January 2018 MSS, Plaintiff was able to sit for a total of four hours per eight-hour workday, occasionally lift or carry no more than five pounds, and stand or walk no more than one hour.

The ALJ rejected Dr. Kings' opinions and determined that Plaintiff had the RFC to perform medium work with some restrictions. Medium works requires the ability to occasionally lift or carry fifty pounds, frequently lift or carry 25 pounds, and stand or walk for six hours in an eight-hour workday. See 20 C.F.R.§§ 404.1567(b), (c); Combs v. Berryhill, 878 F.3d 642, 645 n. 5 (8th Cir. 2017). In her decision, the ALJ summarized the evidence of Plaintiff's medical exams and treatment, but she did not specifically identify evidence that supported Plaintiff's ability to stand or walk up to six hours, occasionally lift or carry fifty pounds, and frequently lift or carry twenty-

19

five pounds.  See, e.g., Gilmore v. Saul, No. 1:19-CV-104 JAR, 2020 WL 5801042, at *4 (E.D. Mo. Sep. 29, 2020).

The ALJ's conclusory statement that Dr. King's opinions were not supported by her own treatment notes or the medical record as a whole did not constitute "good reason" for discrediting Dr. King's opinions.  Because the ALJ erred in failing to appropriately weigh Dr. King's opinions, substantial evidence on the record as a whole does not support the ALJ's determination that Plaintiff was capable of performing medium work.  The Court therefore remands this cause to the Defendant for a proper assessment of Plaintiff's physical functional limitations.[7]

Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

　　　　　　　　　　　　　　　　　　　　　／s／ Patricia L. Cohen  
　　　　　　　　　　　　　　　　　　　　　PATRICIA L. COHEN  
　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of January, 2022

---

[7] Because remand is required, the Court does not address all of Plaintiff's arguments.  See, e.g., Berry v. Kijakazi, No. 4:20-CV-890 RLW, 2021 WL 4459699, at *9 (E.D. Mo. Sep. 29, 2021).